**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**Fort Myers Division**

Case No.: _____

**MICHAEL FLYNN, an individual,**

     Plaintiff,

v.

**NANCY PELOSI, in her official capacity as**
**Speaker of the United States House of**
**Representatives;**

**BENNIE G. THOMPSON, in his official**
**capacity as Chair of the Select Committee**
**to Investigate the January 6th Attack on the**
**United States Capitol;**

**ELIZABETH L. CHENEY, in her official**
**Capacity as a member of the United States**
**House of Representatives;**

**ADAM B. SCHIFF, in his official**
**capacity as a member of the United States**
**House of Representatives;**

**JAMIE B. RASKIN, in his official**
**capacity as a member of the United States**
**House of Representatives;**

**SUSAN E. LOFGREN, in her official**
**Capacity as a member of the United States**
**House of Representatives;**

**ELAINE G. LURIA, in her official**
**capacity as a member of the United States**
**House of Representatives;**

1

**PETER R. AGUILAR, in his official
capacity as a member of the United States
House of Representatives;**

**STEPHANIE MURPHY, in her official
capacity as a member of the United States
House of Representatives;**

**ADAM D. KINZINGER, in his official
capacity as a member of the United States
House of Representatives;**

**SELECT COMMITTEE TO INVESTIGATE
THE JANUARY 6TH ATTACK ON THE
UNITED STATES CAPITOL;**

Defendants.

_____/

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiff, Lieutenant General Michael Flynn (Ret.) ("General Flynn"),

a private citizen, brings this complaint for declaratory and injunctive relief to

invalidate and prohibit the enforcement of a subpoena from the Select Committee

to Investigate the January 6th Attack on the United States Capitol (the "Select

Committee") issued in whole or in part without legal authority and demanding

information from General Flynn and testimony by him in violation of his

Constitutional rights and the laws of the United States.

2.      General Flynn further seeks declaratory and injunctive relief

prohibiting the Select Committee from obtaining or releasing any records of

General Flynn or his family's communications that the Select Committee obtained

through subpoenas issued to telecommunications providers that were likewise

issued in whole or in part without legal authority in violation of the Constitution

and laws of the United States.

3.      At the times relevant herein, General Flynn was and is a private

citizen. Like many Americans in late 2020, and to this day, General Flynn has

sincerely held concerns about the integrity of the 2020 elections. It is not a crime to

hold such beliefs, regardless of whether they are correct or mistaken, to discuss

them with others, to associate with those who share the same belief, or to ask the

government to address such political concerns. Indeed, it is our fundamental

Constitutional right to speak about and associate around political issues that

concern us, and to petition our government about those grievances. *See* U.S. Const.

Amen. I.

4.      Yet, on November 8, 2021, the Select Committee mailed its subpoena

to General Flynn (the "Subpoena").  The Subpoena commanded General Flynn

produce documents in response to twenty sweeping and vague demands covering a

year and a half time frame—by November 23, 2021.  Further, it commanded

General Flynn to appear for a deposition on December 6, 2021. As discussions

with Committee counsel made clear, these demands were addressed to discovering

General Flynn's political beliefs, and demanded he produce evidence for those

beliefs and identify those to whom he communicated and with whom he associated about those beliefs, as well as any communication of those beliefs to the President.

5.     General Flynn has raised significant Constitutional and practical concerns that preclude his compliance with the subpoena without clarification of its scope and terms by the Select Committee, and reconciliation of the Subpoena's commands with his rights under the 5th Amendment to not be a witness against himself due to an active criminal investigation into the same issues, as well as his 1st Amendment rights to freedom of speech and association, and to petition the government to redress grievances.

6.     However, the Select Committee has stubbornly refused to provide any clarification or cooperation to resolve these issues. Indeed, Chairman Thompson made a public statement on December 2, 2021 that those who appear before his Select Committee and invoke their 5th Amendment privilege against self-incrimination are "part and parcel guilty to what occurred."[1] This statement is utterly inconsistent with a legislative investigation. The Select Committee is rushing to refer any non-cooperative witnesses for criminal prosecution by the Department of Justice for contempt of Congress.  Thus, General Flynn is caught

---

[1] Tim Hains, "Jan. 6 Committee Chairman Bennie Thompson: If You Plead The Fifth, You're 'Part & Parcel Guilty,'" RealClear Politics, Dec. 2, 2021, https://www.realclearpolitics.com/video/2021/12/02/january_6_committee_chairman_bennie_thompson_if_you_plead_the_fifth_youre_part_and_parcel_guilty.html.

4

between alternatives that both risk criminal prosecution by the Department of Justice, either in an ongoing criminal probe, or in a new prosecution for contempt of Congress.

7.     The Select Committee has also issued sweeping subpoenas to telecommunications providers seeking records of various individuals in connection with its investigation. Upon information and belief, the Select Committee has sought or intends to seek records pertaining to General Flynn *and his family* by issuing one or more subpoenas to their telecommunications and electronic mail providers—as it has done with other witnesses.  When confronted about this outrageous intrusion into the private records of a cooperative witness in a legislative investigation, risking a violation of General Flynn's rights under the 1st, 4th, and 5th Amendments to the Constitution, the Select Committee responded with nothing but silence.

8.     Without intervention by this Court, General Flynn faces the harm of being irreparably and illegally coerced to produce information and testimony in violation of the law and his constitutional rights.  He will also be illegally and irreparably harmed by the Select Committee's unlawful and secret seizure of his and his family's personal information from their telecommunications and/or electronic mail service providers.

9.     Only an Order by this Court can prevent General Flynn from suffering these grave and irreparable harms.

## PARTIES

10.     Plaintiff Lieutenant General Michael Flynn is a retired Lieutenant General in the United States Army, served as the Director of the Defense Intelligence Agency from July 2012 to August 2014, and was the National Security Advisor at the start of the Trump Administration. He was famously led into a perjury trap by the Federal Bureau of Investigation, pled guilty to making a false statement after the government threatened his son and then agreed not to prosecute his son if he pled guilty.  He later sought to withdraw that plea under the guidance of new counsel after the discovery of exculpatory evidence that was withheld from him prior to his guilty plea. When the Department of Justice decided to drop the charges against him, a court stayed his sentencing while the Court considered whether to force the Department of Justice to prosecute him. Ultimately, General Flynn received a Presidential pardon. (The Subpoena curiously seeks documents from General Flynn starting just before the Department of Justice sought to dismiss the charges against him in May of 2020, and long before the 2020 election or the January 2021 attack on the Capitol.) In late 2020, General Flynn publicly stated his concerns about the integrity of the 2020 elections, as did many other citizens. General Flynn did not organize or speak at any events on January 6 in Washington,

6

D.C.  In 2021, General Flynn was briefly a board member of a nonprofit founded and led by his defense counsel, Ms. Powell, called Defending the Republic.  In September 2021, a federal prosecutor handling the January 6 Capitol attack as well as the criminal contempt of Congress proceedings against individuals referred by the Select Committee also subpoenaed the records of Defending the Republic in connection with a criminal investigation into its activities.

11.     Defendant Nancy Pelosi ("Speaker Pelosi") is a Democrat member of the U.S. House of Representatives and Speaker of the House.

12.     Defendant Bennie G. Thompson ("Chairman Thompson") is a Democrat member of the U.S. House of Representatives and Chairman of the Select Committee to Investigate the January 6th Attack on the United States Capitol. Subpoenas challenged herein were issued with his authority as Chair.

13.     Defendant Elizabeth L. Cheney is a Republican member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

14.     Defendant Adam B. Schiff is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

15.     Defendant Jamie B. Raskin is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

16.     Defendant Susan E. Lofgren is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

17.     Defendant Elaine G. Luria is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

18.     Defendant Peter R. Aguilar is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

19.     Defendant Stephanie Murphy is a Democrat member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

20.     Defendant Adam D. Kinzinger is a Republican member of the U.S. House of Representatives and member of the Select Committee to Investigate the January 6th Attack on the United States Capitol.

21.    The Select Committee is a select committee created by House Resolution 503 ("H. Res. 503") passed by the U.S. House of Representatives on June 30, 2021.

## JURISDICTION AND VENUE

22.    The Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1331 as Defendants' actions have violated General Flynn's rights under the 1st, 4th, and 5th Amendments to the United States Constitution as explained herein.

23.    Venue is proper under 28 U.S.C. § 1391(b) as a substantial part of the events giving rise to the claim, to wit, the service of the Subpoena to General Flynn, occurred in the Middle District of Florida, General Flynn—the target of the Select Committee's action whose compelled live testimony in Washington, D.C., and records they demand—is a resident of the State of Florida, and the requested documents sought by the Committee are located in the State of Florida.

## FACTUAL BACKGROUND

24.    On January 6, 2021, a large group of people in Washington, D.C., entered the U.S. Capitol, breached security, and disrupted the counting of Electoral College votes until order was restored. The U.S. Department of Justice has arrested more than 500 individuals in connection with those activities on January 6th. General Flynn was not part of, nor was he present, at the Capitol grounds during

any of those activities at the Capitol that day.  Like most Americans, he saw those troubling events unfold on television.

**A. Formation, Composition, and Authority of the Select Committee**

25.     Earlier this year, Congress considered establishing a "National Commission to Investigate the January 6 Attack on the United States Capitol Complex."

26.     Chairman Thompson introduced H.R. 3233 on May 14, 2021. H.R. 3233 would have established the Commission for four "purposes":

a.  "To investigate and report upon the facts and causes relating to the January 6, 2021, domestic terrorist attack upon the United States Capitol Complex (hereafter referred to as the "domestic terrorist attack on the Capitol") and relating to the interference with the peaceful transfer of power, including facts and causes relating to the preparedness and response of the United States Capitol Police and other Federal, State, and local law enforcement in the National Capitol Region and other instrumentality of government, as well as the influencing factors that fomented such attack on American representative democracy while engaged in a constitutional process."

b.  "To examine and evaluate evidence developed by relevant Federal, State, and local governmental agencies, in a manner that is respectful of ongoing law enforcement activities and investigations regarding the domestic

terrorist attack upon the Capitol, regarding the facts and circumstances surrounding such terrorist attack and targeted violence and domestic terrorism relevant to such terrorist attack."

c.   "To build upon the investigations of other entities and avoid unnecessary duplication by reviewing the findings, conclusions, and recommendations of other Executive Branch, congressional, or independent bipartisan or non-partisan commission investigations into the domestic terrorist attack on the Capitol and targeted violence and domestic terrorism relevant to such terrorist attack, including investigations into influencing factors related to such terrorist attack."

d.   "To investigate and report to the President and Congress on its findings, conclusions, and recommendations for corrective measures that may include changes in law, policy, procedures, rules, or regulations that could be taken to prevent future acts of targeted violence and domestic terrorism, including to prevent domestic terrorist attacks against American democratic institutions, improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans, and strengthen the security and resilience of the Nation and American democratic institutions against domestic terrorism."

H.R. 3233, 117th Congress (2021).

27.    The Commission would have included a bipartisan group of ten members: (1) a "Chairperson" "appointed jointly by the Speaker of the House of Representatives and the majority leader of the Senate"; (2) a "Vice Chairperson" "appointed jointly by the minority leader of the House of Representatives and the minority leader of the Senate"; (3) "two members . . . appointed by the Speaker of the House of Representatives"; (4) "two members . . . appointed by the minority leader of the House of Representatives"; (5) "two members . . . appointed by the majority leader of the Senate"; and (6) "two members . . . appointed by the minority leader of the Senate." *Id.* Because Democrats control both chambers in the current Congress, the Commission would have included five members appointed by Democrats and five members appointed by Republicans.

28.    The House passed H.R. 3233 on May 19, 2021.[2]

29.    The Senate considered a cloture motion to proceed on H.R. 3233 on May 28, 2021. The motion failed by a vote of 54 yeas and 35 nays. *Id.*

30.    On June 28, 2021, Speaker Pelosi introduced H. Res. 503, "Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol." Two days later, the House passed H. Res. 503 on a near

---

[2] Congress.gov, "H.R. 3233 – National Commission to Investigate the January 6 Attack on the United States Capitol Complex Act," *available at* https://www.congress.gov/bill/117th-congress/house-bill/3233/actions (last accessed Dec. 16, 2021).

party-line vote of 222 yeas and 190 nays.[3] Only two Republicans, Rep. Liz Cheney of Wyoming and Rep. Adam Kinzinger of Illinois, voted in favor of H. Res. 503.[4]

31.    In contrast to H.R. 3233, which contemplated an evenly balanced Commission, H. Res. 503 instructs the Speaker of the House to appoint thirteen members to the Select Committee, only five of which "shall be appointed after consultation with the minority leader." H. Res. 503.

32.    Speaker Pelosi appointed Chairman Thompson, the original sponsor of H.R. 3233, to serve as Chair of the Select Committee and appointed six additional Democrat members: Rep. Zoe Lofgren of California, Rep. Adam Schiff of California, Rep. Pete Aguilar of California, Rep. Stephanie Murphy of Florida, Rep. Jamie Raskin of Maryland, and Rep. Elaine Luria of Virginia. She also appointed Republican Rep. Liz Cheney of Wyoming without any designation of position. 167 Cong. Rec. H3597 (2021).

33.    House Minority Leader Kevin McCarthy recommended five Republican members to serve on the Select Committee, consistent with H. Res. 503: Rep. Jim Banks of Indiana, to serve as Ranking Member, and Rep. Rodney

---

[3] Congress.gov, "H.Res.503 – Establishing the Select Committee to Investigate the January 6th Attack on the United States Capitol," *available at* https://www.congress.gov/bill/117th-congress/house-resolution/503/actions (last accessed Dec. 16, 2021).

[4] Clerk, United States House of Representatives, "Roll Call 197," *available at* clerk.house.gov/Votes/2021197 (last accessed Dec. 16, 2021).

Davis of Illinois, Rep. Jim Jordan of Ohio, Rep. Kelly Armstrong of North Dakota, and Rep. Troy Nehls of Texas, to serve as additional minority members.[5]

34.    Speaker Pelosi did not appoint Rep. Banks to serve as Ranking Member, nor did she appoint any other of Minority Leader McCarthy's recommended minority members. In a public statement, she acknowledged that her refusal to appoint the members recommended by the Minority Leader was an "unprecedented decision."[6]

35.    Instead, Speaker Pelosi appointed Rep. Adam Kinzinger and Rep. Liz Cheney— the only two Republicans who voted in favor of H. Res. 503—and left four vacancies. *See* 167 Cong. Rec. H3885 (2021).

36.    Without reference to any authority, on September 2, 2021, Chairman Thompson announced in a press release that "he has named Representative Liz Cheney (R-WY) to serve as the Vice Chair of the Select Committee."[7] H. Res. 503

---

[5] Washington Post, "Jim Jordan, four other Republicans chosen by House Minority Leader Kevin McCarthy to serve on panel investigating Jan. 6 riot," *available at* https://www.washingtonpost.com/politics/jim-jordan-four-other-republicans-chosen-by-house-minority-leader-kevin-mccarthy-to-serve-on-panel-investigating-jan-6-riots/2021/07/19/85c6b534-e8df-11eb-8950-d73b3e93ff7f_story.html (last accessed Dec. 16, 2021).

[6] Nancy Pelosi, Speaker, U.S. House of Representatives, Pelosi Statement on Republican Recommendations to Serve on the Select Committee to Investigate the January 6th Attack on the U.S. Capitol (July 21, 2021), https://www.speaker.gov/newsroom/ 72121-2.

[7] *See* Press Release, Bennie Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, Chairman Thompson Announces Representative Cheney as Select Committee Vice Chair (Sept. 2, 2021), https://january6th.house.gov/news/press-releases/chairman-thompson-announces-representativecheney-select-committee-vice-chair.

does not mention a vice chair, much less authorize the chair to appoint a vice chair. *See generally* H. Res. 503, 117th Cong. (2021).

37.     The official letterhead of the Select Committee indicates that Bennie Thompson is "Chairman" and lists the other members, including Cheney and Kinzinger, without designation. *See, e.g.*, Ex. A. The Select Committee's website provides a list of its members, including Thompson as Chairman, but no other members receive designation.[8]

38.     H. Res. 503 provides that "[t]he Select Committee may not hold a markup of legislation."

39.     H. Res. 503 sets forth the purposes of the Select Committee, which are substantially similar to those of the Commission contemplated by H.R. 3233, except that H. Res. 503 omits the fourth purpose: "[t]o investigate and report to the President and Congress on its findings, conclusions, and recommendations for corrective measures that may include changes in law, policy, procedures, rules, or regulations. . . ."

40.     H. Res. 503 establishes three "functions" of the Select Committee: (1) to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol"; (2) to "identify, review, and evaluate the causes of

---

[8] *See* Membership, Select Comm. to Investigate the Jan. 6 Attack on the U.S. Capitol, https://january6th.house.gov/about/ membership (last visited Dec. 15, 2021).

and the lessons learned from the domestic terrorist attack on the Capitol"; and (3) to "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures described in subsection (c) as it may deem necessary."

41. Subsection (c) of Section 4 describes three categories of "corrective measures": "changes in law, policy, procedures, rules, or regulations that could be taken" (1) "to prevent future acts of violence, domestic terrorism, and domestic violent extremism, including acts targeted at American democratic institutions"; (2) "to improve the security posture of the United States Capitol Complex while preserving accessibility of the Capitol Complex for all Americans"; and (3) "to strengthen the security and resilience of the United States and American democratic institutions against violence, domestic terrorism, and domestic violent extremism." H. Res. 503.

42. H. Res. 503 provides that "[t]he chair of the Select Committee, upon consultation with the ranking minority member, may order the taking of depositions, including pursuant to subpoena, by a Member or counsel of the Select Committee, in the same manner as a standing committee pursuant to section 3(b)(1) of House Resolution 8, One Hundred Seventeenth Congress." Section 3(b)(1) of H. Res. 8 provides that, "[d]uring the One Hundred Seventeenth Congress, the chair of a standing committee. . . , upon consultation with the

ranking minority member of such committee, may order the taking of depositions, including pursuant to subpoena, by a member or counsel of such committee."

### B. Activities of the Select Committee

43.     Since its inception in July 2021, the Select Committee has held only one public hearing for the purpose of hearing testimony. During that hearing, the Select Committee heard testimony from officers of the U.S. Capitol Police and D.C. Metropolitan Police Departments who were present at the Capitol on January 6, 2021.[9]

44.     In August, the Select Committee demanded records from fifteen different social media companies, including Facebook, Reddit, Twitter, and YouTube. *See* Press Release, Bennie G. Thompson, Chairman, Select Comm. to Investigate the Jan. 6th Attack on the U.S. Capitol, Select Committee Demands Records related to January 6th Attack from Social Media Companies (Aug. 27, 2021). The subpoenas directed these companies to produce all internal company policies and actions taken relating to "misinformation" about the 2020 election, efforts to interfere with the 2020 election or electoral results, violent domestic extremists, foreign interference with the 2020 election, and more. *Id.*

---

[9] *See* Fox News, "Jan. 6 commission hearings on Capitol attack: LATEST UPDATES," *available at* foxnews.com/live-news/jan-6-commission (last accessed Dec. 16, 2021).

45.    The Select Committee has also issued what it describes as "sweeping" demands for presidential records from the National Archives and Records Administration ("NARA") and seven other Executive Branch agencies. *See* Press Release, Bennie G. Thompson, Chairman, Select Committee to Investigate the January 6th Attack on the United States Capitol, Select Committee Issues Sweeping Demand for Executive Branch Records (Aug. 25, 2021).

46.    Pursuant to the procedures set forth in the Presidential Records Act of 1978, former President Trump has asserted executive privilege over some of the responsive documents in NARA's custody. *See* Compl. Ex. 5, *Trump v. Thompson*, No. 1:21-cv-2769 (D.D.C. 2021).

47.    On October 8, 2021, the Biden White House instructed the Archivist of the United States to release the documents requested by the Select Committee on the grounds that President Biden wishes to waive executive privilege over subpoenaed records over which former President Trump has asserted executive privilege.[10]

48.    On October 18, 2021, former President Trump filed a lawsuit in the U.S. District Court for the District of Columbia, seeking declaratory and injunctive

---

[10] *See* Second Letter from Dana A. Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 8, 2021), https://www.whitehouse.gov/briefing-room/statements releases/2021/10/13/ second-letter-fromdana-a-remus-counsel-to-the-president-to-david-ferriero-archivist-of-the-united-states-datedoctober-8-2021/ (last accessed Dec. 16, 2021).

relief to stop NARA from producing any privileged documents in response to the Select Committee's requests. Former President Trump described the Committee's NARA subpoena as "an illegal, unfounded, and overbroad records request." *See* Compl. *Trump v. Thompson*, No. 1:21-cv-2769 (D.D.C. 2021).

49.     On November 9, District Judge Tanya S. Chutkan denied former President Trump's motion for a preliminary injunction. *See* Mem. Op. 17, *Trump v. Thompson*, No. 1:21-cv-2769 (D.D.C. Nov. 9, 2021).

50.     Former President Trump appealed the district court's order, and the D.C. Circuit Court of Appeals enjoined NARA from releasing the disputed Presidential records pending its ruling. *See* Mem. Op. 17, *Trump v. Thompson*, No. 1:21-cv-2769 (D.D.C. Nov. 9, 2021).

51.     On November 30, 2021, the D.C. Circuit held oral argument on the merits of former President Trump's appeal. This case is still pending.

52.     The Select Committee has also issued numerous subpoenas seeking the production of documents and compelled testimony from individual witnesses, including more than a dozen former Trump Administration officials.

**C. The Select Committee's Subpoena**

53.     On November 8, 2021, the Select Committee served the Subpoena on General Flynn by mailing it to him at his home in Englewood, Florida. Ex. A.  The

subpoena was also personally served on General Flynn at his home by the United States Marshals Service on November 9, 2021.

54.     The Subpoena includes a broad set of document requests that pertain to his 1st Amendment activity as a private citizen, including the basis of his political beliefs, what he communicated about his political beliefs, and to whom he communicated those political beliefs.  The Subpoena comprises twenty categories, including requests conflating records regarding lawful activity at the core of the 1st Amendment with potentially illegal activity, requests for information about broad topics without any connection to General Flynn's own actions or the January 6 attack on the Capitol, requests overlapping with a current and active criminal investigation into a nonprofit General Flynn briefly served as a director, and documents or communications relating to the 2020 election or the January 6 attacks, two of the most profound recent events in American history, and the lawful 1st Amendment-protected activities of others—without a nexus to unlawful actions taken by General Flynn or others:

a. "All documents and communications referring or relating in any way to plans, efforts, or discussions regarding challenging, decertifying, overturning, or contesting the results of the 2020 Presidential election."

b. "All documents and communications relating in any way to purported election irregularities, election-related fraud, or other election-related malfeasance."

c. "All documents for reviewing, assessing, communicating, or reporting on the security of election systems in the United States."

d. "All documents and communications relating in any way to alleged interference with the tabulation of votes by machines manufactured by Dominion Voting Systems."

e. "All documents and communications relating in any way to alleged interference in the fall 2020 election by foreign governments, organizations, or individuals."

f. "Any documents and communications relating in any way to foreign influence in the United States 2020 Presidential election through social media narratives and disinformation."

g. "All documents and communications about strategies or plans for communications, messaging, fundraising, and social media relating to allegations of fraud, irregularities, or other malfeasance, including sample or suggested messages, emails, social media posts, voice mails, or telephone conversations."

h. "All recordings of you or that you made related to the fall 2020 election or your, or others', work with the Trump re-election campaign."

i. "All communications with or about former President Trump or White House staff relating in any way to purported fraud in, or challenges to, the fall 2020 election."

j. "All documents and communications relating in any way to the possibility of the Department of Justice filing documents in state or federal courts regarding allegations of election fraud and/or the certification of the results of the election."

k. "All documents and communications relating in any way to state legislatures' selection, or potential selection, of alternate sets of electors to cast electoral votes in the fall 2020 election."

l. "All documents and communications relating in any way to Congress's or the Vice President's role in the certification of the votes of the electoral college."

m. "All documents and communications with or about Professor John Eastman or Mark Martin relating in any way to the fall 2020 election."

n. "All documents and communications relating in any way to any state legislature's selection, or potential selection, of alternate sets of electors to cast electoral votes in the fall 2020 election."

o. "All documents and communications relating to protests, marches, public assemblies, rallies, and speeches in Washington, DC, on November 14, 2020, December 12, 2020, January 5, 2021, and January 6, 2021 (collectively, 'Washington Rallies')."

p. "Documents or other materials referring or relating to the financing or fundraising associated with the Washington Rallies and any individual or organization's travel to or accommodation in Washington, D.C., to attend or participate in the Washington Rallies."

q. "All recordings, transcripts, notes (including electronic and hand-written notes), summaries, memoranda of conversation, readouts, or other documents memorializing communications between you and President Trump, any members of the White House staff, and/or Members of Congress on January 5 or January 6, 2021, relating or referring in any way to the fall 2020 election or the attack on the Capitol."

r. "All documents and communications relating to the January 6, 2021, attack on the U.S. Capitol."

s. "All documents and communications related to your January 2021 meetings with individuals associated with President Trump and his re-election campaign, including, but not limited to, meetings held at the Willard Hotel."

t. "From November 3, 2020, through January 20, 2021, all documents and communications related to the Twenty-Fifth Amendment to the U.S. Constitution, the Insurrection Act, or martial law."

Ex. A.

55.     The Subpoena directed Plaintiff to produce all responsive documents by November 23, 2021 at 10:00 a.m., which was just over two weeks after its issuance.

56.     The Subpoena also demanded that General Flynn appear for a deposition to provide testimony at 10:00 a.m. on December 6, 2021.

### D. Criminal Probe of Sidney Powell's Nonprofit Organization

57.     In September 2021, the Department of Justice obtained a grand jury subpoena for records of a nonprofit General Flynn briefly served as a director, which was founded and led by his criminal defense counsel, Sidney Powell.  The subpoena was signed by an Assistant U.S. Attorney prosecuting matters related to the January 6 Capitol attack as well as contempt of Congress charges against Stephen K. Bannon for not complying with the Committee's subpoena. Isaac Stanley-Becker, Emma Brown, and Rosalind Helderman, *Prosecutors Demanded Records of Sidney Powell's Fundraising Groups As Part of Criminal Probe*, NEW YORK TIMES, Nov. 30, 2021.

### E. General Flynn's Efforts to Cooperate with the Select Committee's Investigation

24

58.     General Flynn retained counsel to assist him with a response to the
Select Committee's Subpoena. Counsel, in turn, retained the services of a vendor
to collect and process General Flynn's documents, which it did, so that they could
be preserved, reviewed and produced to the Select Committee. Counsel also began
a series of discussions with the Select Committee's counsel to clarify the scope of
the subpoena and the Select Committee's priorities considering the impossibly
tight deadlines in its subpoena. Counsel for General Flynn repeatedly raised
concerns under the 1st and 5th amendments, as well as privilege issues concerning
General Flynn's communications with Ms. Powell. Although the Committee
agreed to postpone General Flynn's deposition to December 20, 2021, it would not
agree to clarify or prioritize the Subpoena's requests. On December 16, 2021, the
Committee announced it would postpone General Flynn's deposition to a date to
be determined.

59.     On December 20, 2021, counsel for General Flynn notified counsel
for the Committee that its legal concerns with the subpoena issued to General
Flynn remained unresolved, especially the prospect of waiving rights and
privileges with any document production or testimony, that there appeared to be no
prospect these issued would be resolved absent the intervention of a court, and that
General Flynn would seek the Court's protection.  Committee counsel responded
that the Committee's preference would be for General Flynn to invoke his 5th

Amendment privilege before the Committee, even if it was effectively the only

think he could do, and that the Committee could refer General Flynn for

prosecution for contempt of Congress for not doing so.  On December 21, 2021,

General Flynn filed this action.

### F. The Select Committee's Subpoenas to Telecommunications Providers

60.    Upon information and belief, the Select Committee is not only

targeting a wide variety of individuals with sweeping subpoenas, but also is

obtaining extensive private records about various individuals—including

cooperating witnesses—by issuing subpoenas to their telecommunications

providers.

61.    For example, the Select Committee issued a subpoena to Verizon

Wireless seeking subscriber information and cell phone data associated with

former White House Chief of Staff, Mark Meadows (the "Verizon Subpoena").

The subscriber information requested includes subscriber names and contact

information, authorized users, time of service provided, account changes,

associated IP addresses, and other metadata. The cell phone data requested could

include all calls, text messages, and other records of communications associated

with that phone number. This data can be used for historic cell site analysis. The

Verizon Subpoena requested all of Mr. Meadows' personal cell phone data for four

months: from October 1, 2020, and January 31, 2021.

62.     The breadth and invasiveness of the Verizon Subpoena—including targeting the communications of the families of the committee's witnesses—also gave the appearance of a criminal investigation, not a legislative fact-finding mission. It seeks private data used to track an individual person's communications and location, information that would bear on an investigation into that individual, not on potential legislation to be passed by Congress. It also requests this data for a period more than three months prior to January 6, 2021, the ostensible focus of the Committee's supposed legislative recommendations.

63.     Public reports released on December 7, 2021, indicate that the Select Committee has issued subpoenas to collect the phone data of more than 100 individuals.[11] This type of investigation to analyze the location and communication, with the clear intent to determine possible coordination between individuals, is reminiscent of a criminal investigation, not legislative intent.

64.     Upon information and belief, the Select Committee has issued or intends to issue a subpoena to telecommunications providers regarding General Flynn's subscriber information and cell phone data similar in form and content to the Verizon Subpoena, except that its target would be General Flynn's records, and possibly his family's records, rather than those of Mr. Meadows.

---

[11] *See* Zachary Cohen, et al., "Exclusive: January 6 committee casts a wide net with over 100 subpoenas for phone records," https://www.cnn.com /2021/12/ 07/politics/january-6-committee-phone-records/index.html.

## REASONS WHY THE SUBPOENAS ARE INVALID

### A. The Select Committee Is Not a Duly Authorized Committee

65.    The composition of the House Select Committee to Investigate the January 6th Attack on the United States Capitol is governed by Section 2 of H. Res. 503. Section 2(a) states "Appointment Of Members.—The Speaker shall appoint 13 Members to the Select Committee, 5 of whom shall be appointed after consultation with the minority leader." H. Res. 503.

66.    Speaker Pelosi has appointed only nine members to the Select Committee: seven Democrats and two Republicans. None of these members was appointed from the selection of five GOP congressmen put forth by Minority Leader Kevin McCarthy.

67.    Authorized congressional committees have subpoena authority implied by Article I of the Constitution. *McGrain v. Daugherty*, 273 U.S. 135, 174 (1927). The Select Committee, however, is not an authorized congressional committee because it fails to comport with its own authorizing resolution, H. Res. 503.

68.    Congress' failure to act in accordance with its own rules is judicially cognizable. *Yellin v. United States*, 374 U.S. 109, 114 (1963). This is particularly significant where a person's fundamental rights are involved.

28

69.     Speaker Pelosi failed to appoint members consistent with the authorizing resolution of the Select Committee. Pelosi has appointed only nine members of Congress to serve on the Select Committee; whereas the authorizing resolution instructs the Speaker "shall" appoint thirteen members. H. Res. 503 § 2(a).

70.     Further, of those nine members Speaker Pelosi has appointed, none of them was appointed after consultation with the minority member, as is required by the authorizing resolution. H. Res. 503 § 2(a).

71.     Thus, the Select Committee as it currently stands—and stood at the time it issued the subpoenas in question—has no authority to conduct business because it is not a duly constituted Select Committee. The Subpoena and any third-party subpoena seeking General Flynn and his family's records are invalid and unenforceable.

72.     Chairman Thompson derives the authority to issue subpoenas solely from § 5(c)(6) of the Select Committee's authorizing resolution, but this authority is qualified, not absolute. The Select Committee chairman may not order the taking of depositions without consultation with the ranking minority member of the Select Committee.

73.     The Select Committee has no ranking minority member. Therefore, Chairman Thompson failed to make the requisite consultation before issuing the

29

subpoena that compelled General Flynn to appear for a deposition. Indeed, such consultation was impossible because no properly appointed ranking minority member exists. The ordering of General Flynn's deposition runs afoul of the Select Committee's authorizing resolution, making it invalid and unenforceable.

74.     The importance of these rules is twofold: (A) the Select Committee only has the authority granted to it by the resolution approved by the House; and (B) the rules at issue here were designed to ensure the Select Committee was duly constituted and operated in a manner to maximize bipartisan legitimacy and minimize partisan abuse in the exercise of its powers.

## B. The Subpoena Was Not Issued to Further a Valid Legislative Purpose

75.     The Select Committee issued the Subpoena as part of an unconstitutional attempt to usurp the Executive Branch's authority to enforce the law, circumvent the rights of potential defendants in a criminal proceeding, and to use Congressional power to persecute political opponents for electoral advantage. Congress has no authority to issue subpoenas for these purposes.

76.     Congress has no freestanding power to issue subpoenas. Instead, its investigative powers are ancillary to its legislative authority. *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020). Because of this tie between the investigative and legislative powers, Congress may only issue subpoenas that serve a valid legislative purpose.

77.     General law enforcement is not a valid legislative purpose. To the extent Congress seeks to utilize subpoenas to investigate and punish perceived criminal wrongdoing, it unconstitutionally intrudes on the prerogatives of the Executive Branch. It is also not competent in criminal enforcement, including lacking experience operating within Constitutional limits applicable to criminal proceedings, and risks violating the Constitutional separation of powers.

78.     Similarly, a desire to "expose for the sake of exposure" cannot sustain a congressional subpoena. *Watkins v. United States*, 354 U.S. 178, 200 (1957). Bringing information to light for the sake of bringing it to light, much less doing so for partisan electoral advantage, is not a valid legislative end.

79.     Even if Congress uses a subpoena to seek information relevant to contemplated legislation, the subpoena may still be invalid if the contemplated legislation would be unconstitutional—such as an impermissible limit on the conduct or authority of the Executive Branch, *see McGrain v. Daugherty*, 273 U.S. 135, 171 (1927); *Kilbourn v. Thompson*, 103 U.S. 168, 195 (1880); *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982), or an infringement on the rights of citizens to freedom of speech, association, assembly, and petition.

80.     The legislative purpose inquiry analyzes whether a *particular subpoena* serves a valid purpose, not whether an investigation as a whole serves a valid purpose. See *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020).

81.    The Select Committee has failed to identify any legislative purpose served by the Subpoena. It has not considered any draft legislation, nor has it provided any explanation for why its requests to General Flynn would further any valid legislative end.

82.    Counsel for General Flynn asked committee counsel to clarify the purpose served by the requests in the Subpoena, only to be told that Congress's power is broad.

83.    Instead of identifying any valid end or proposed legislation, the Select Committee has issued public statements explicitly identifying law enforcement and the desire to expose for the sake of exposure as its motivations for subpoenaing General Flynn.

84.    Chairman Thomas and Member Cheney (given the title "Vice Chair" by the Committee Chair, though he has no power under H. Res. 503 to confer titles on members) have reiterated in their public statements that the purpose of their investigation is to ensure "those responsible are held accountable," to "tell[] the complete story of the unprecedented and extraordinary events of January 6th," and to "get answers for the American people about what happened on January 6th." *The Law Enforcement Experience on January 6th: Hearing Before the H. Select Committee to Investigate the January 6th Attack on the United States Capitol*, 117th Cong. (2021) Statement of Elizabeth Cheney, Vice-Chair); Press Release,

*Thompson & Cheney Statement on Pentagon Officials' Reported Actions After January 6th* (Sept. 16, 2021); Press Release, *Thompson Statement on Cooperation of Witnesses* (Oct. 14, 2021).

85.     The Select Committee's authorizing resolution also fails to identify its legislative purpose. It is vague to the point of meaninglessness, authorizing the Select Committee to "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including facts and circumstances relating to… entities of the public and private sector as determined relevant by the Select Committee for such investigation." H. Res. 503.

86.     Nor is the nature of the information sought by the Subpoena of a kind that would further a valid legislative purpose.

87.     The Subpoena seeks records of General Flynn's core 1st Amendment activities, information temporally and logically disconnected from the events of January 6, and information that is irrelevant to any conceivable legislation.

88.     This information sought by the Subpoena has no bearing on any contemplated constitutional legislation, nor would any information sought by a subpoena similar in form or content to the Verizon Subpoena seeking records relating to General Flynn or his family. They are relevant only to serve the Select Committee's stated purpose of engaging in ad-hoc law enforcement and its unstated purpose of antagonizing its political adversary.

## C. The Subpoena Violates General Flynn's 1st Amendment Rights of Free Speech, Political Activity, and Free Association

89.     The Subpoena violates General Flynn's rights to engage in free speech, free association, and petition the government. These associational and expressive activities are protected by the 1st Amendment. *See Buckley v. Valeo*, 424 U.S. 1, 64 (1976); *Black Panther Party v. Smith*, 661 F.2d 1243, 1267 (D.C. Cir. 1981); *Am. Fed'n of Lab. & Cong. of Indus. Organizations v. Fed. Election Comm'n*, 333 F.3d 168, 179 (D.C. Cir. 2003); *Cooper v. Dillon*, 403 F.3d 1208, 1213–14 (11th Cir. 2005).

90.     Even if investigating the facts, circumstances, and causes of the January 6 episode (as federal prosecutors and agents are) were somehow related to a legislative purpose, the Select Committee seeks records from General Flynn that in no way further the Select Committee's stated purpose. For example, the Select Committee demands records evincing General Flynn's assessment of and communications regarding "the security of election systems," all communications with a law professor and a former North Carolina chief justice "relating in any way to the fall 2020 election," and all documents and communications relating to any meeting General Flynn had with President Trump or his re-election campaign in January 2021. These demands, among others, implicate General Flynn's core rights under the 1st Amendment.  He was at all relevant times a private citizen who, like any other, had political views.  If he can be hauled before Congress to be forced to

provide documentation of views he has or once had, explain his views, and justify them with evidence, which would be a frightening vision of the state of American freedom, anyone can.

91.    The Subpoena is also a clear effort to chill the speech of the Committee Member's political adversaries.

92.    The body that issued the Subpoena is composed of 9 members, 7 of whom belong to the political party that opposed the President under whom General Flynn served. The remaining two members were Republicans hand-picked by Speaker Pelosi because they were vocal opponents of former President Trump from within the Republican Party.

93.    The Subpoena would serve no substantive purpose in the Select Committee's investigation—it will not turn up any new relevant information. General Flynn's political views, which are not unique, are widely known and readily accessible through numerous articles and other media.[12]

94.    Allowing an entirely partisan select committee of Congress to obtain General Flynn's records and communications relating to his political activities,

---

[12] *See, e.g.*, Fox News, "Exclusive: One-on-One with General Michael Flynn," *available at* https://uk.finance.yahoo.com/video/exclusive-one-one-general-michael-035118495.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbVS8&guce_referrer_sig=AQAAAHLewzPFSYvO0mLCOSzBDj8eAnMB0qtfTNrTGUts1oWlslaG99qm-4L5BagM7ydi1BCgPrllwyKeAzwfrptWO1ycfRZ77AY069_AMYT9bUAQv-LeKcsbJreHMirvN_EcjRF5ODAJkI1iDKbdWeZIkdpBoUA5Hnx5Uc9dQfVznI9K (last accessed Dec. 20, 2021).

associations, and speech as a private citizen would work a massive infringement and chilling of his 1st Amendment rights.

95.     The Select Committee's asserted interest is insufficient and its alternative means of obtaining this information are too obvious to justify such a drastic chilling of speech.

96.     In the event that the Select Committee has issued or intends to issue a subpoena similar in form and content to the Verizon Subpoena regarding General Flynn or his family's records, such a subpoena would also violate General Flynn's core 1st Amendment rights.

**D. The Subpoena Violates General Flynn's 4th Amendment Rights**

97.     The 4th Amendment enumerates the right of private individuals to be free from unreasonable search and seizure by the government into their persons, houses, papers, and effects. It also protects a person's reasonable privacy expectations. *Katz v. United States*, 389 U.S. 347, 351 (1967).

98.     The 4th Amendment restricts the ability of the Select Committee to issue sweeping subpoenas untethered from any valid legislative purpose. *See Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 196 (1946).

99.     A congressional subpoena must be reasonable. An all-encompassing subpoena for personal, nonofficial documents falls outside the scope of Congress'

legitimate legislative power. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2040 (2020).

100.   The Select Committee's subpoena to General Flynn is so broad and indefinite as to exceed the lawfully authorized purpose of the Select Committee. *See McPhaul v. United States*, 364 U.S. 372, 381 (1960).

101.   The Select Committee's subpoena seeking General Flynn's documents and communications involving a wide-range of subjects, such as his general thoughts on election security, political strategy regarding campaign messages, and communications about legal challenges involving the 2020 election, is overly broad with respect both to the timeframe and the subject matters in question. It exceeds any authorized purpose of the Select Committee, let alone any Constitutional legislative purpose.

102.   Counsel for General Flynn have repeatedly asked the Select Committee's counsel to discuss narrowing the subpoena to a reasonable scope and to terms that can be understood and used to identify responsive records, but this request has been repeatedly denied.

103.   As the Subpoena exceeds the lawfully authorized purpose of the Select Committee, compelling General Flynn to comply with the Subpoena would violate General Flynn's 4th Amendment protection against unlawful search and seizure. The Subpoena is therefore invalid and unenforceable.

104.   In the event that the Select Committee has issued or intends to issue a subpoena similar in form and content to the Verizon Subpoena regarding General Flynn or his family's records, such a subpoena would also violate General Flynn's 4th Amendment rights as General Flynn has a reasonable expectation of privacy in his personal cell phone data.

### E. The Subpoena Violates General Flynn's 5th Amendment Privilege Against Self-Incrimination

105.   The Subpoena violates General Flynn's 5th Amendment privilege against self-incrimination to the extent that the compelled production of documents in response thereto would carry an implicitly testimonial aspect and his deposition would compel potentially incriminating testimony.

106.   The very act of producing records to the Select Committee—including email, text, and potentially other communication records—could constitute testimony as to factual information, which the government could use against General Flynn in connection with the aforementioned criminal investigation, including the persons with whom he communicated, the times of those communications in relation to other events, and the frequency of any such communications. Insofar as the government is seeking to allege a conspiracy, and use the statements of alleged conspirators against each other, such information is typically an important part of the government's proof. In fact, the Department of Justice has already issued a grand jury subpoena to an organization that General

Flynn was a board member of which was dedicated in part to the same election issues the Select Committee is investigating.

107.   The Supreme Court has recognized that "[t]he act of producing evidence in response to a subpoena . . . has communicative aspects of its own, wholly aside from the contents of the papers produced," and that "[c]ompliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control[.]" *Fisher v. United States*, 425 U.S. 391, 410 (1976). Indeed, where the compelled production of documents "involve[s] testimonial self-incrimination," the act of producing such documents privileged under the 5th Amendment. *See United States v. Doe*, 465 U.S. 605, 613 (1984) (footnote omitted). The compelled production of documents may involve testimonial self-incrimination where the "enforcement of the subpoenas would compel [respondent] to admit that the records exist, that they are in his possession, and that they are authentic." *Id.* at 613 n.11.

108.   Compelling General Flynn to produce the types of records identified in the Subpoena would violate General Flynn's 5th Amendment privilege against self-incrimination to the extent that admissions that certain records exist, that they are in his possession, and that they are authentic may be used as evidence against him in the aforementioned criminal investigation.

**PRAYER FOR RELIEF**

**WHEREFORE**, General Flynn asks the Court to enter Judgment in his favor and against Defendants and to order the following relief:

a. A declaratory judgment that the Subpoena and any subpoena similar in form and content to the Verizon Subpoena targeting General Flynn are ultra vires, unlawful, and unenforceable;

b. A declaratory judgment that the Subpoena and any subpoena similar in form and content to the Verizon Subpoena targeting General Flynn serve no valid legislative purpose and exceed the Select Committee's Constitutional authority;

c. A declaratory judgement that the Subpoena and any subpoena similar in form and content to the Verizon Subpoena targeting General Flynn violates General Flynn's rights under the 1st Amendment and those of members of his family;

d. A declaratory judgment that the Subpoena and any subpoena similar in form and content to the Verizon Subpoena targeting General Flynn violates General Flynn's rights under the 4th Amendment and those of members of his family;

e. A declaratory judgment that the Subpoena violates General Flynn's 5th Amendment privilege against self-incrimination;

f. In the alternative, an order modifying the Subpoena and any subpoena similar in form and content to the Verizon Subpoena targeting General Flynn to seek only unprivileged information that does not infringe on General Flynn's constitutional rights or those of members of his family;

g. An injunction quashing the Subpoena and any subpoena similar in form and content to the Verizon Subpoena targeting General Flynn or members of his family;

h. An injunction prohibiting Defendants from imposing sanctions for noncompliance with the Subpoena and any subpoena similar in form and content to the Verizon Subpoena targeting General Flynn or members of his family;

i. An injunction prohibiting Defendants from inspecting, using, maintaining, or disclosing any information obtained as a result of the Subpoena and any subpoena similar in form and content to the Verizon Subpoena targeting General Flynn or members of his family;

j. An award in favor of General Flynn for his reasonable expenses, including attorneys' fees and costs, incurred as a result of the Subpoena; and

k. Any and all other relief that the Court deems just and proper.

[*continued on following page*]

Dated: December 21, 2021          Respectfully submitted,


/s/ Matthew Sarelson
Matthew Seth Sarelson, Esq.
**DHILLON LAW GROUP INC.**
255 Giralda Avenue, Suite 500
Coral Gables, Florida 33134
305-773-1952
msarelson@dhillonlaw.com
Florida Bar No. 888281

David A. Warrington, Esq.
(special admission pending)
**DHILLON LAW GROUP INC.**
2000 Duke Street, Suite 300
Alexandria, Virginia 22314
571-400-2120
dwarrington@dhillonlaw.com

Michael A. Columbo, Esq.
(special admission pending)
Jesse Franklin-Murdock, Esq.
(special admission pending)
**DHILLON LAW GROUP INC.**
177 Post Street, Suite 700
San Francisco, California 94108
415-433-1700
mcolumbo@dhillonlaw.com
jfranklin-murdock@dhillonlaw.com


Counsel for Plaintiff Michael Flynn